# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

VICTOR LE,
on Behalf of Himself and All Others
Similarly Situated,

                Plaintiff,

v.

KOHLS DEPARTMENT STORES, INC.
and KOHLS CORPORATION,

                Defendants.

Case No. 15-CV-1171-JPS

ORDER

      The plaintiff, Victor Le ("Le"), on behalf of himself and others similarly situated, filed the complaint in this action on September 30, 2015. (Docket #1). In short, Le claims that he and putative class members have suffered—and continue to suffer—from unfair, deceptive, and unlawful business practices implemented by the defendants, collectively "Kohls."[1] (Docket #1 ¶ 1). Before any issues related to class certification could be resolved, however, Kohls moved to dismiss Le's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Docket #18). That motion is now fully briefed and ripe for adjudication. As explained in further detail below, Kohls' motion will be denied.

---

[1] The defendants both spell the name of their corporation with an apostrophe, that is, "Kohl's." *See* KOHL'S, http://www.kohls.com (last visited Jan. 27, 2016). However, for the purpose of this Order, the Court will refer to the defendants collectively as "Kohls," without an apostrophe. This will be done with no other purpose than to avoid the Court's grammatical resort to the double genetive. *See Possessives and Attributives*, THE CHICAGO MANUAL OF STYLE ONLINE, http://www.chicagomanualofstyle.org/qanda/data/faq/topics/PossessivesandAttr ibutives.html (last visited Feb. 2, 2016).

1.  BACKGROUND

Before delving into the complex legal issues underlying this motion, the Court must first provide an overview of: (1) the parties; (2) the factual background of this case; and (3) Le's claims in relation to the pending motion to dismiss.

1.1  The Parties

Plaintiff, Victor Le, is a citizen of California.[2] (Docket #1 ¶ 10). During the relevant time period, Le alleges that he purchased merchandise from Kohls at a "sale" or "discount" price off of the "regular" or "original" item prices. (Docket #1 ¶ 10).

Defendant Kohls Corporation is a Wisconsin company with its principal place of business located at N56 W17000 Ridgewood Drive, Menomonee Falls, Wisconsin. (Docket #1 ¶ 11). Defendant Kohls Department Stores, Inc., is a Delaware company with its principal place of business located at N56 W17000 Ridgewood Drive, Menomonee Falls, Wisconsin.[3] (Docket #1 ¶ 11). Kohls operates approximately 1,162 department stores in 49 states, including 37 stores in Wisconsin, 126 stores in California, and an e-commerce website (www.Kohls.com). (Docket #1 ¶ 16). Kohls sells private label, exclusive and national brand apparel, footwear, accessories, beauty, and home products. (Docket #1 ¶ 16).

---

[2]Unless otherwise stated, the Court will draw the relevant facts from Le's complaint. (Docket #1); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) ("As a general rule, on a Rule 12(b)(6) motion, the court may consider only the plaintiff's complaint.").

[3]As referenced above, the Court will herein refer to the plaintiff as "Le" and the defendants collectively as "Kohls."

### 1.2 Factual Background

The gravamen of Le's complaint is that Kohls uses inflated or fabricated "original" prices on its merchandise so that Kohls' products—and Kohls' "sale" prices—appear more attractive to consumers. (Docket #1 ¶¶ 2, 8, 20-28). Le describes this practice as a "misleading discount price comparison scheme," which is, according to Le, deceptive and thereby harms consumers. (*See* Docket #1 ¶ 5).

More specifically, Le alleges that Kohls engages in a company-wide, pervasive, and continuous campaign of falsely claiming that each of their products sells at far higher prices than by other merchants. (Docket #1 ¶ 27). He asserts that this practice in turn induces consumers to purchase merchandise at purportedly marked-down sale prices. (Docket #1 ¶¶ 23-29). Le thus claims the "item prices" or "original" prices advertised by Kohls do not reflect a price at which Kohls' products are routinely, if ever, sold to retail customers. (Docket #1 ¶¶ 23-29). This concept was most aptly demonstrated by the plaintiff in a graph (*see* Table 1), which was prepared by Consumers' Checkbook/Center for the Study of Services ("CSS"), an independent, nonprofit consumer organization based in Washington, D.C. (Docket #1 ¶ 35).[4] Quoting CSS, Le claims that graph proves the point that, "at Kohl's, the sales often never end." (Docket #1 ¶ 40) (internal citations omitted).

---

[4]According to Le, beginning in June 2014, and continuing through March 2015, CSS conducted a survey of seven national retail chains and Amazon.com, tracking prices weekly for six to ten big-ticket items from each retailer. (Docket #1 ¶ 36).



Table 1: Comparison of Kohls' Regular Prices and Offer Prices

According to Le, the issue with Kohls' advertising scheme is that it misleads consumers into believing that Kohls' prices are significantly lower than the prices regularly offered for those products—by Kohls itself or other merchants. (Docket #1 ¶¶ 20-27). Under this theory, Kohls' marketing tactics are economically harmful because they deceive consumers to: (1) buy products that they would not have bought "but for" the illusory "sale"; or (2) pay more for products than they would have paid had they been fully informed of the actual "item price" for that merchandise. (Docket #1 ¶¶ 23-29).

This is, in fact, exactly what Le claims happened to him in March, April, May, and July of 2015 when he shopped at various Kohls stores located in California. (Docket#1 ¶¶ 42-47). Le claims that he "and the members of the [putative] Classes would not have purchased the [Kohls] merchandise...at all, or would not have paid as much for the merchandise

were it not for the purported 'savings' adverted to by [Kohls]." (Docket #1 ¶ 50).

### 1.3 Le's Claims and Kohls' Motion to Dismiss

On September 30, 2015, Le filed this putative class action on behalf of three potential classes. (Docket #1 ¶¶ 64-70, 78-126). He alleged statutory violations of:

1. The Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. § 100.18 ("WDTPA") (Docket #1 ¶¶ 64-70) on behalf of a nationwide class;

2. The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL") (Docket #1 ¶¶ 93-117) on behalf of a California class;

3. The Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA") (Docket #1 ¶¶ 118-126) on behalf of a California class; and

4. Forty consumer protection laws on behalf of a multi-state class of consumers (Docket #1 ¶¶ 78-92).

Le also brings a common law unjust enrichment claim on behalf of a nationwide class or, in the alternative, a California class. (Docket #1 ¶¶ 71-77). The plaintiff brings this unjust enrichment claim under Wisconsin law or, in the alternative, under California law. (Docket #1 ¶¶ 72, 73).

Kohls has moved to dismiss all of these claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). (Docket #18). In support of its motion, Kohls argues that Le: (1) failed to adequately plead the necessary facts showing that he is entitled to restitution under the UCL and CLRA; (2) lacks Article III standing to sue for injunctive relief under the UCL and CLRA; (3) lacks Article III standing to sue under any state law other than California (where he lives and was allegedly injured by Kohls); (4) fails to

state a claim under the WDTPA because Le "saw" the allegedly deceptive statements in California; (5) fails to state an unjust enrichment claim under Wisconsin law because he entered into express contracts with Kohls; and (6) fails to state an unjust enrichment claim under California law because unjust enrichment is not a cognizable cause of action in California. *(See generally* Docket #19). Le opposes all of these arguments. (Docket #24).

2.      LEGAL STANDARD

"A motion to dismiss pursuant to [Rule] 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must state enough facts that, when accepted as true, 'state a claim for relief that is plausible on its face.'" *Spierer v. Rossman*, 798 F.3d 502, 510 (7th Cir. 2015) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). The Court must "tak[e] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiffs." *Pugh v. Tribune Co.*, 521 F.3d 686, 692 (7th Cir. 2008).

Similarly, "[m]otions to dismiss under Rule 12(b)(1) are meant to test the sufficiency of the complaint, not to decide the merits of the case." *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-89 (7th Cir. 2014) (citing *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 n.1 (7th Cir. 1996)); *see also Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) (applying the same principle to motions under Rule 12(b)(6)). As when deciding a Rule 12(b)(6) motion, "[i]n the context of a motion to dismiss for lack of subject

matter jurisdiction, [the Court must] accept as true the well pleaded factual allegations, drawing all reasonable inferences in favor of the plaintiff." *Iddir v. INS*, 301 F.3d 492, 496 (7th Cir. 2002). However, "a plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met." *See Burwell*, 770 F.3d at 588-89 (citing *Kontos v. U.S. Dep't Labor*, 826 F.2d 573, 576 (7th Cir. 1987)).

3.      ANALYSIS

Kohls argues that "each and every" one of Le's purported claims for relief should be dismissed under Rule 12(b)(1) and/or Rule 12(b)(6). (*See* Docket #19 at 2). For the sake of clarity, the Court will discuss these issues on an argument-by-argument basis.

3.1     Monetary Damages under the UCL and CLRA

On behalf of a class of California citizens, Le seeks restitution[5] under the UCL (Docket #1 ¶¶ 100, 108, 117) and CLRA (Docket #1 ¶¶ 124–25); *see also* Cal. Bus. & Prof. Code § 17200 (West); Cal. Civ. Code § 1770 (West). On the one hand, "[a] UCL action is an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff or persons represented by the plaintiff through unfair or unlawful business practices." *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 173 (2000). The UCL "covers a wide range of conduct," including "unlawful,

---

[5]Restitution is the only form of monetary relief available under the UCL. *See Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 179 (1999). Although the CLRA provides for damages rather than restitution, the standard for recovering damages under the CLRA is the same as the standard for recovering restitution under the UCL. *Compare Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 675-76 (2006) *with Paz v. Playtex Products, Inc.*, No. 07CV2133 JM (BLM), 2008 WL 111046, at *3 (S.D. Cal. Jan. 10, 2008). The parties acknowledge this in their briefs. (Docket #19 at 18; Docket #24 at 13).

Case 2:15-cv-01171-JPS   Filed 02/08/16   Page 7 of 40   Document 32

unfair or fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising." *See* Cal. Bus. & Prof. Code § 17200 (West)*; see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1142 (2013). Similarly, the CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code, § 1770(a) (West). This includes: (1) "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have"; (2) "[a]dvertising goods or services with intent not to sell them as advertised"; and (3) "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code, § 1770(a) (5), (9), (13) (West). "The standards for determining whether a representation is misleading under the UCL apply equally to claims under the CLRA." *Colgan*, 135 Cal. App. 4th at 675-76. Likewise, the same standards for recovering restitution apply both to the UCL and CLRA. *Id.*; *see also Paz*, 2008 WL 111046, at *3.

Before delving into the parties' arguments, the Court must clarify the precise issues that are raised in Kohls' Rule 12(b)(6) motion. At bottom, the heart of this motion to dismiss is whether Le states a viable claim for restitution under the UCL and CLRA.

Kohls argues that the *only* legally cognizable method of calculating Le's restitution is through the price-to-value method. (Docket #19 at 9-17; Docket #26 at 7-15). In other words, Kohls claims that Le is only entitled to restitution if he can prove that there was a difference between: (1) the value of the products that Le purchased; and (2) the price that Le paid for those products. (Docket #19 at 11-14) (describing the price-to-value method as "price paid minus value received"). Therefore, because Le did not *allege* that he purchased Kohls' products at prices that exceed those products' values,

Kohls argues that Le did not plead a cognizable claim for restitution and his UCL and CLRA claims must be dismissed under Rule 12(b)(6). (Docket #19 at 13-14).

Le responds that Kohls' interpretation of California law is overly narrow and inappropriate in this case. (*See* Docket #24 at 13-18). He argues that the UCL and CLRA permit courts to rely on a variety of measures when calculating restitution, not just price-to-value method proposed by Kohls. (Docket #24 at 15-18). Le alleges that, based on the type of harm that he has suffered, an appropriate methodology for calculating restitution will likely include either: (1) full restitution; (2) partial restitution based on the false "transaction value" promised by Kohls; or (3) partial restitution in the amount that Kohls profited from its allegedly deceptive pricing scheme. (Docket #24 at 5; Docket #25, Ex. 3 at 4-6). Ultimately, however, Le emphasizes that deciding the appropriate method by which to calculate his restitution is fact-intensive and premature at this stage of the litigation. (Docket #24 at 18-20).

In light of these arguments, the Court must address three interrelated questions: (1) whether California law recognizes any other alternative measures of restitution under the UCL and CLRA (*i.e.*, is the price-to-value method the *only* permissible way to calculate restitution?);[6] (2) assuming alternative restitutionary measures do exist, whether the nature of Le's economic "loss" requires the Court to consider the value of the merchandise that Le received when calculating restitution; and (3) whether the Court must

---

[6] Le does not dispute that his complaint fails to allege that he purchased Kohls' merchandise at prices greater than their value. (*See generally* Docket #1). Thus, if the price-to-value method is the only method by which the Court can calculate Le's restitution under the UCL and/or CLRA, the Court need not go any further as Le's complaint would surely fail to state a claim under Rule 12(b)(6).

determine the proper measure of restitutionary recovery at the pleading stage. Of course, each of these questions must be viewed from the procedural lens from which the court sits: a Rule 12(b)(6) motion to dismiss.

First, the Court agrees with Le's interpretation of California law, namely, that restitutionary relief under the UCL and CLRA is not strictly and categorically confined to the price-to-value method as proffered by Kohls. Second, the Court concludes that it need not decide Kohls' contention that any potential restitution in this case must take into account the value that Le received from the merchandise that he purchased. Though Kohls presents persuasive arguments in this regard, such a decision is not one that can or should be made at this juncture.

### 3.1.1 Restitution Under the UCL and CLRA is not Confined to the Price-to-Value Method

In order to decide whether restitution under the UCL and CLRA is strictly confined to the price-to-value measure, the Court must provide some background on California consumer protection law. Courts have broad equitable powers to enforce both the UCL and CLRA. *See Yanting Zhang v. Superior Court*, 57 Cal. 4th 364, 371, 304 P.3d 163, 168 (2013) (citing *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 173 (2000)); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 506 (S.D. Cal. 2013) ("A court awarding restitution under the California consumer protection laws has 'very broad discretion to determine an appropriate remedy award as long as it is supported by the evidence and is consistent with the purpose of restoring to the plaintiff the amount that the defendant wrongfully acquired.'") (internal citations omitted). For example, to enforce the UCL's unfair competition provisions, the California legislature authorized "court[s] [to] make such orders or judgments…as may be necessary to restore to any person in interest any

Case 2:15-cv-01171-JPS   Filed 02/08/16   Page 10 of 40   Document 32

money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203 (West). Similarly, the CLRA authorizes courts to award to "[a]ny consumer who suffers any damage as a result of" conduct proscribed in that statute "to recover or obtain any of the following: (1) [a]ctual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000); (2) [a]n order enjoining the methods, acts, or practices; (3) [r]estitution of property; (4) [p]unitive damages; [and] (5) [a]ny other relief that the court deems proper." Cal. Civ. Code § 1780(a) (West).

The California Supreme Court, however, has not articulated a single definition for what an "order[] for restitution" means under these statutes. On the one hand, in *Kraus,* the Court broadly held that a restitution order is one that "compel[s] a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." *Korea Supply Co.*, 29 Cal. 4th at 1149 (citing *Kraus v. Trinity Mgmt. Servs., Inc.*, 23 Cal. 4th 116, 126-27 (2000)). On the other hand, in *Cortez*, the Court more narrowly described restitution as "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received." 23 Cal. 4th at 174; *see also In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009) (same).

Despite these different forms, however, California jurisprudence reveals that restitution under the UCL and CLRA is consistently awarded with the goal of "restoring" plaintiffs with money and/or property that has been wrongfully taken as a result of the defendant's unlawful practices. *See Korea Supply Co.*, 29 Cal. 4th at 1147-48 ("[T]he language of section 17203 is clear that the equitable powers of a court are to be used to 'prevent' practices

that constitute unfair competition and to 'restore to any person in interest' any money or property acquired through unfair practices."); *Cortez*, 23 Cal. 4th at 168 ("The object of the restitution order [in a UCL] case [is] money that once had been in the possession of the person to whom it was to be restored. The *status quo ante* to be achieved by the restitution order [is] to again place the victim in possession of that money."); *Kraus*, 23 Cal. 4th at 129 ("The statutory authorization in section 17203 to make orders necessary to restore money to any person in interest is clear."); *cf. Yanting Zhang*, 57 Cal. 4th at 371 ("In deciding whether to grant the remedy or remedies sought by a UCL plaintiff…consideration of the equities between the parties is necessary to ensure an equitable result.") (internal citations omitted); *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 794 (2015) (underscoring the principle that "restitution under the UCL may not be based *solely* on deterrence") (emphasis added).

Keeping in mind the goal of restitution, the California Supreme Court's holdings reveal that the appropriate measure of recovery depends on the nature of the case and the alleged harm that he/she suffers. *Cf. Russell v. Kohl's Dep't Stores, Inc.*, Case No. 5:15-CV-01143-RGK-SP, slip op. at 4 (C.D. Cal. Oct. 6, 2015) ("[A]lternative measures of restitution may be appropriate based on the circumstances of each case."). This is precisely why, in *Cortez*, the Court held that a restitution award of backpay wages—which are frequently the subject of actual damage awards—was an authorized measure of recovery to restore money to plaintiffs who were deprived overtime wages. *Cortez*, 23 Cal. 4th at 178; *cf. Korea Supply Co.*, 29 Cal. 4th at 1149 (explaining that the remedy sought by the plaintiffs was not "restitutionary because plaintiff d[id] not have an ownership interest in the money it s[ought] to recover from defendants").

Other courts have likewise interpreted California's consumer protection laws to authorize multiple forms of restitutionary recovery. *See e.g.*, *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 983 (9th Cir. 2015); *Russell*, Case No. 5:15-CV-01143-RGK-SP, slip op. at 3-5; *Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO, 2015 WL 1526559, at *5 (C.D. Cal. Mar. 23, 2015). In fact, a recent California appellate court addressed this precise issue, explaining that "*Vioxx*['s] [price-to-value method] does not purport to set forth the *exclusive* measure of restitution potentially available" in a consumer fraud case. *In re Tobacco Cases II*, 240 Cal. App. 4th at 792 (emphasis added); *see also Johns v. Bayer Corp.*, No. 09-CV-1935-AJB DHB, 2012 WL 1520030, at *5 (S.D. Cal. Apr. 30, 2012) (finding that neither *Vioxx* nor any other case cited by the defendant "suggest[ed] that the difference in price paid and value received is the only proper measure of restitution").

Thus, this Court agrees that California case law has not cabined restitution under the UCL and/or CLRA to the price-to-value method as argued by Kohls.

### 3.1.2 Determining an Appropriate Restitution Award is Inappropriate at the Pleading Stage

Next, the Court must address the related issues of: (1) whether, *in this case*, the price-to-value method is nonetheless the only cognizable legal theory under which Le could recover restitution; and, therefore, (2) whether Le's failure to allege the value that he received for Kohls' merchandise affects the viability of Le's complaint. *See Russell*, at *4, No. 5:15-CV-01143-RGK-SP, slip op. at 4 (explaining the distinction between the availability of alternative restitutionary measures under the UCL and the viability of such measures). On the one hand, Kohls argues that even if there are alterative ways to calculate restitution under the UCL and CLRA, the price-to-value method is

Case 2:15-cv-01171-JPS   Filed 02/08/16   Page 13 of 40   Document 32

the only appropriate measure where, as here, a plaintiff receives some value from his/her purchases. (Docket #19 at 11-13). Otherwise, according to Kohls, Le's proposed restitution measures will over-compensate Le's financial loss and thereby will put him in a better position than if the alleged misconduct had not occurred. (Docket #19 at 14-17). Le does not specifically address how the value of his Kohls' merchandise might figure into his proffered restitutionary measures. Rather, he argues that even if the products' value is considered, the appropriate restitution award—and method by which restitution is calculated—must be resolved at a later date with a more complete factual record. (Docket #24 at 15-20).

The Court again agrees with Le that, at this juncture: (1) the Court need not decide whether the price-to-value method is the only cognizable measure of Le's restitution in this case; and (2) therefore, Le's failure to plead that he purchased Kohls' products at a price greater than their value is not fatal to Le's claim. *See In re Tobacco Cases II*, 240 Cal. App. 4th at 794 n.8 (explaining that the lower court had rejected the plaintiff's request to determine the applicable measure of restitution before trial, during "which time plaintiffs were free to argue for any measure of restitution they deemed proper"); *see also Russell*, at *4, Case No. 5:15-CV-01143-RGK-SP, slip op. at 3 (finding that the plaintiff's failure to plead the value of the defendant's merchandise was not sufficient to bar his claim UCL claim under Rule 12(b)(6)). On the one hand, this Court acknowledges—as Kohls points out—that the appeals court in *In re Tobacco Cases II* ultimately concluded that "[b]ecause plaintiffs obtained value from Marlboro Lights apart from the deceptive advertising," the price-to-value method was indeed "the proper measure of restitution" under California law. *Id.* at 794. Importantly, however, Kohls fails to highlight that the *In re Tobacco Cases II* court

determined the appropriate restitutionary remedy with the benefit of a full trial record before it. *Id.* at 784; *see also id.* at 794 n.8 (explaining how the court had "rejected [the] plaintiffs' request that it determine the measure of restitution applicable" before trial because it did not want to "potentially bind itself to a remedy that may or may not be appropriate given the state of evidence"). Unlike the court in *In re Tobacco Cases II*, this Court does not have the benefit of discovery and a complete evidentiary record from which to conclude that price-to-value differential is indeed the "proper measure" of restitution in this case. And, Kohls does not direct the Court to any cases holding that a UCL plaintiff must *plead* the precise measure of restitution that is appropriate for his/her case in order to survive a Rule 12(b)(6) motion to dismiss.

Similarly, at this early stage the Court declines to decide what role the value of Le's merchandise will ultimately play in a potential recovery. This question is inextricably tied to the facts and theories that the parties develop during the course of the litigation, particularly as they relate to the alleged "loss" that Le has suffered. *Cf. Pulaski & Middleman, LLC*, 802 F.3d at 989 (holding that the plaintiff's proposed alternative method of restitution was sufficient for the purpose of class certification purposes because it "measure[d] the monetary loss 'resulting from the particular injury' alleged") (internal citations omitted). For its part, Kohls maintains that Le has not suffered any loss because he does not allege to have paid more for Kohls' products than what those products were valued. (Docket #26 at 10-11). Under this theory, the value of Kohls' merchandise is indeed critical to Le's potential recovery. However, Le does not claim his "loss" flows from having purchased products over the prices at which they were valued. (Docket #1 ¶¶ 8, 29, 50). Instead, he claims that, as a result of Kohls' marketing tactics:

(1) he bought products that he would not have bought "but for" Kohls' illusory "sales;" and/or (2) he paid more for products than he would have paid had he been fully informed of the actual "item prices" for that merchandise. (*See* Docket #1 ¶¶ 8, 23-29, 41-50). Thus, the value or benefit that the Kohls' merchandise conferred to Le and the putative plaintiffs may play a more nuanced role than Kohls appreciates in any potential restitution award in this case.

The Ninth Circuit addressed a strikingly similar set of arguments when reviewing a class certification decision in *Pulaski & Middleman, LLC.* 802 F.3d at 983. In that case, the plaintiffs claimed that Google's Adwords program violated the UCL "by failing to disclose the placement of AdWords ads on parked domains and error pages." *Id.* Indeed, even though the plaintiffs may have gained some benefit or value as a result of their advertisements appearing on unauthorized webpages, the Court evaluated Pulaski's proposed restitution measures with goal of "restoring" the plaintiff's loss. *Id.* at 988-989.

To determine the appropriate measure of restitution, the Ninth Circuit closely analyzed the nature of Pulaski's alleged economic harm. *Id.* The court explained that the loss associated with being "deceived by misrepresentations into making a purchase" is that "the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Id.* In this information gap type of circumstance, the court held that a proper form of restitution must take into account "what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Id.* (adding that restitution in this type of case "need not account for benefits received *after* purchase because the focus is on the value of the service at the

time of purchase. Instead…the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information.") (emphasis added); *see also Russell*, No. 5:15-CV-01143-RGK-SP, slip op. at 4-6. At least one of Le's proposed measures of restitution seems to correlate with the theory articulated by the *Pulaski* court. (Docket #25, Ex. 3 at 6-9) (describing the "transaction value" method of restitution, which would be calculated by measuring "the amount that each class member would have paid had Defendants offered a discount from the actual 'regular' price").

Kohls spills much ink arguing that measures such as those proposed in *Pulaski*, *Spann*, and by Le are not restitutionary in nature. (Docket #19 at 14-17). Kohls argues that neither Le's full refund, false discount value, nor net profits method takes into account the value that a purchaser like Le might have received from Kohls' merchandise. As such, Kohls argues that Le's proposed measure would allow him to recover *more* than what would be available to him under a theoretical tort claim. (Docket #19 at 14-17).

Indeed, this Court recognizes that Le's proposed monetary damages under the UCL and CLRA are confined to restitutionary damages. *See Korea Supply Co.*, 29 Cal. 4th at 1148. Le himself concedes this point. (Docket #24 at 13). Moreover, "restitution without proof of any loss to any plaintiff cannot be characterized as restitutionary." *In re Tobacco Cases II*, 240 Cal. App. 4th at 801. Contrary to Kohls' view, however, this Court does find that Le has alleged sufficient loss to support his claims under the UCL and CLRA at this juncture of litigation. And, like the court in *In re Tobacco Cases II*, the Court need not decide the precise method of restitution under which Le will be able to recover restitution, if he recovers anything at all. Indeed, Courts such as this one do not have unlimited power to fashion monetary remedies under

the UCL and CLRA. *See Korea Supply*, 29 Cal.4th at 1148 ("A court cannot, under the equitable powers of section 17203, award whatever form of monetary relief it believes might deter unfair practices."). And, Kohls raises valid concerns regarding a potential windfall in this case if Le's restitution is not designed and/or limited in such a way as to restore only those losses which are attributable to Kohls' allegedly unlawful acts. (Docket #26 at 11-13). Moreover, the fact that Le argues that alternative forms of restitution—*i.e.*, forms that look beyond the price-to-value method—may be available to him does not relieve him of the duty to support his purported measure of restitution "by substantial evidence." *Colgan*, 135 Cal. App. 4th at 672. Ultimately, however, these are issues for another day.

In sum, all that this Court deems necessary to decide with respect to Kohls' motion at this pleading stage is that Le has alleged sufficient facts to show that: (1) he has suffered some cognizable economic loss under the UCL and CLRA; and (2) that restitutionary remedies to restore Le's alleged loss *may* be available to him under California law. *Cf. Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014) (upholding the dismissal of a state consumer fraud claim that failed to set forth "any facts to support his conclusory assertions of actual damage"). (Docket #1 ¶¶ 23-29). It is simply too premature to define what those potential restitutionary remedies are.

And, as such, Le's failure to allege that his purchased Kohls' merchandise at a price higher than its value is not fatal to his claim.[7]

### 3.2     Injunctive Relief under the UCL

Le also seeks injunctive relief under the UCL. (Docket #1 ¶¶ 100, 108, 117). However, Kohls moves to dismiss Le's claim for injunctive relief under Rule 12(b)(1) because they assert that Le lacks Article III standing to pursue his claim.[8] Specifically, Kohls argues that because Le is aware of Kohls' alleged deceptive price comparison scheme, he cannot be "realistically threatened by a repetition of the violation." (Docket #19 at 18-20) (citing *Cattie v. Wal-Mart Stores, Inc.* 504 F. Supp. 2d 939, 951 (S.D. Cal. 2007)).

In response, Le contends that the fact he is "aware" of the defendants' conduct does not deprive him of standing. (Docket #24 at 20-23). Rather, he

---

[7]Kohls also argues in its reply brief that Le's allegation of loss is merely sufficient to show that he standing to sue under the UCL; it does not suffice to show that he is "*entitle[d]*" to restitution. (Docket #26 at 13-14) (emphasis in original). This Court acknowledges that standing and entitlement to restitution are indeed two distinct concepts. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 337 (2011). However, as described above, this Court has not only concluded that Le has suffered cognizable loss under the UCL (*i.e.*, that he has standing), but also that, based on this alleged loss, Le *may* be entitled to alternative measures of restitutionary relief, such as those articulated in *Pulaski* and *Spann*. *Cf. Prata v. Superior Court*, 91 Cal. App. 4th 1128, 1139 (2001) (finding that the plaintiff was not entitled to "restitution of the finance and interest charges if any were incurred by him. But the record reflects that he refused to pay these charges. Therefore, he [wa]s not entitled to individual restitution."). As discussed above, making a definitive decision on Le's entitlement to restitution is not a proper subject for a motion to dismiss. *Id.; see also In re Tobacco Cases II*, 240 Cal. App. 4th at 794 n.8.

[8]Besides restitution, the UCL also permits recovery in the form of an injunction. *See In re Tobacco II Cases*, 46 Cal. 4th at 319 ("[T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction.").

argues that standing doctrine recognizes that where the defendants have engaged in "years-long and repeated misconduct," there is a sufficient likelihood that the unlawful conduct will continue. (Docket #24 at 20). Moreover, Le points out that if Kohls' theory is accepted, injunctive relief would become impossible for UCL plaintiffs to obtain. (Docket #24 at 21-22). This is because a plaintiff must know that the defendant's advertising scheme is deceptive in order to sue; and, under Kohls' theory, as soon as plaintiffs would become aware of such unlawful conduct, they would automatically lose standing to seek an injunction. (Docket #24 at 21-22).

For reasons explained below, the Court concludes that Le has constitutional standing to pursue a claim for injunctive relief under the UCL and will deny Kohls' motion to dismiss this claim pursuant to Rule 12(b)(1).

Article III of the Constitution limits the federal courts' ability to decide "cases and controversies." U.S. CONST. art. III, § 2. Springing out of this limitation, courts have created a number of justiciability doctrines to cabin the courts' power. *See O'Sullivan v. City of Chicago*, 396 F.3d 843, 853 (7th Cir. 2005). One of those doctrines is that of standing. *Id.* In layman's terms, standing seeks to determine whether the proper plaintiff is before the court. *See Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015).

In order to establish they have standing under Article III, plaintiffs must demonstrate: "(1) an 'injury in fact,' that is, 'an invasion of a legally protected interest which is…concrete and particularized, and…actual or imminent'; (2) a causal connection between the injury and the challenged conduct, meaning that the injury is 'fairly traceable' to the challenged conduct; and (3) a likelihood 'that the injury will be redressed by a favorable decision.'" *Dunnet Bay Const. Co.*, 799 F.3d at 688 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Moreover, "to invoke Article III

jurisdiction a plaintiff in search of prospective equitable relief, [a plaintiff] must show a significant likelihood and immediacy of sustaining some direct injury." *Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir. 2000).

However, "past wrongs, while not sufficient to confer standing for injunctive relief, may be evidence that future violations are likely to occur." *Id.; see also Perry v. Sheahan*, 222 F.3d 309, 313 (7th Cir. 2000) ("'[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief…if unaccompanied by any continuing, present adverse effects.'") (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *cf. Schirmer v. Nagode*, 621 F.3d 581, 588 (7th Cir. 2010) (explaining that while "an isolated" ordinance violation was not sufficient to confer standing, "if we had a record showing a persistent pattern of similar police misconduct" the plaintiffs "might be able to show that they were entitled to injunctive relief of some kind"); *Armstrong v. Davis*, 275 F.3d 849, 861 (9th Cir. 2001) (explaining that "there are at least two ways in which to demonstrate that [prospective] injury is likely to recur": (1) by showing "that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy"; or (2) by showing "that the harm is part of a pattern of officially sanctioned…behavior, violative of the plaintiff's…rights'") (internal citations omitted). It is the plaintiff's burden to prove that he/she has standing to pursue the relief that he/she seeks. *See Edgewood Manor Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 771 (7th Cir. 2013).

Kohls' argument rests on its position that Le does not suffer from "a real and immediate danger" that any alleged harm "will occur in the future." (Docket #19 at 18) (internal citations omitted). However, viewing the facts in the light most favorable to Le, the Court concludes that Le has alleged a "significant likelihood and immediacy" of injury from Kohls' advertising

scheme, and that an order from this Court would be able to redress that harm.

Le claims that Kohls' allegedly deceptive advertising scheme is "company-wide, pervasive, and continuous." (Docket #1 ¶ 27). Thus, Le sufficiently pleads the likelihood of recurring economic injury for Article III standing purposes. *Cf. Perry*, 222 F.3d at 313-14 (dismissing the plaintiff's claim for injunctive relief because he could not "demonstrate a realistic threat that he would be the subject of" the allegedly unlawful conduct).

The Court rejects Kohls' argument that Le's "awareness" of Kohls' alleged pricing scheme somehow strips him of Article III standing. (Docket #19 at 18-20). Though Kohls does not make clear what prong of the standing test they attack with this argument, the Court agrees that "[t]his [question] is best understood as an argument directed to redressability." *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012); *see also Cattie v. Wal–Mart Stores, Inc.*, 504 F. Supp.2d 939, 951 (S.D. Cal. 2007) ("Even if [plaintiff] was [injured], however, it is unclear how prospective relief will redress her injury, since she is now fully aware of the linens' thread count.").

Courts have addressed the issue of how a plaintiff's "awareness" of allegedly unlawful conduct affects standing for the purpose of injunctive relief in different ways. *See Russell*, No. 5:15-CV-01143-RGK-SP, slip op. at 6; *compare Henderson v. Gruma Corp.*, 2011 WL 1362188 (C.D. Cal. 2011) (finding "awareness" of an allegedly false advertising campaign did not preclude standing for injunctive relief) *with Conrad v. Boiron, Inc.*, No. 13 C 7903, 2015 WL 7008136, at *2 (N.D. Ill. Nov. 12, 2015) (ruling there was no standing to pursue injunctive relief for a claimant who challenged the marketing of a homeopathic drug because "[a]t the time the case was filed, he was already well aware of the alleged inefficacy of Oscillo"). However, as explained by

another district court faced with this same "one bitten, twice shy" argument, were the Court to accept Kohls' position that Le's awareness "of the alleged deception [would] operate[] to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases [under the UCL], a wholly unrealistic result." *Ries*, 287 F.R.D. at 533; *see also Henderson*, 2011 WL 1362188, at *7. This is because as soon as a UCL plaintiff would become "aware" of his/her cause of action—at least sufficiently enough to be able to meet the pleading requirements of Federal Rule of Civil Procedure 8(a)—they would be denied standing to pursue an injunction. *See Russell*, No. 5:15-CV-01143-RGK-SP, slip op. at 7. Such a broad holding would "eviscerate the intent of the California legislature," which undeniably provided UCL plaintiffs with the right to seek injunctive relief. *Koehler v. Litehouse, Inc.*, 2012 WL 6217635 (N.D. Cal. 2012); *see also Spann*, 2015 WL 1526559, at *12.

Moreover, while Kohls' argument may be appropriate in the context of a product-specific complaint, the Court cannot agree that Kohls' argument applies with the same force where, as here, the complaint is aimed at a "company-wide, pervasive, and continuous" false advertising campaign. *Cf. Conrad*, 2015 WL 7008136, at *2; *Bohn v. Boiron, Inc.*, 2013 WL 3975126, at *4 (N.D. Ill. Aug. 1, 2013). Unlike *Bohn*, where the plaintiff was clearly put on notice of a certain's drug inefficacy, without further factual development, the Court is unclear just exactly what Le would be expected to be "aware" of in order to avoid future harm from Kohls. *Id.* For example, should Le be "aware" that housewares are deceptively priced, while men's apparel is not? Should Le be "aware" that Kohls' holiday sales are more egregiously deceptive than their day-to-day offers? These hypothetical questions

underscore the point that discovery is necessary to parse out the salient facts in relation to Le's claim for relief.

Kohls relies heavily on *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 741 (7th Cir. 2014). In that case, the plaintiff claimed that the defendants violated various consumer protection statutes by advertising normal retail prices as temporary price reductions. *Id.* at 735. On review, the Seventh Circuit upheld the district court's dismissal of the plaintiff's claim for injunctive relief under the Uniform Deceptive Trade Practices Act ("UDTPA"). *Id.* at 740. The court reiterated that a plaintiff cannot "obtain injunctive relief" if he/she "fail[s] to sufficiently allege that [the defendant's] conduct will likely cause him harm in the future." *Id.* (citing *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 330 Ill. Dec. 826, 909 N.E.2d 848, 857 (2009) ("To be eligible for injunctive relief under the Deceptive Practices Act, a plaintiff must show that the defendant's conduct will likely cause it to suffer damages in the future."). It is true, as Kohls argues, that the court pointed out that the plaintiff was "now aware of [the defendant's] sales practices," and as such he was not "*likely* to be harmed by the practices in the future." *Id.* (emphasis added). However, the court's observation reflected the unremarkable conclusion that "[w]ithout more than the speculative claim that [a plaintiff] will again be harmed by [the defendant], [a plaintiff] is not entitled to injunctive relief." *Id.* As highlighted by the district court, Camasta's complaint had merely put forth the bare assertion that "'there [wa]s a substantial danger that these wrongful retail practices w[ould] continue.'" *Camasta v. Jos. A Bank Clothiers, Inc.*, No. 12-CV-7782, 2013 WL 474509, at *6 (N.D. Ill. Feb. 7, 2013).

Kohls' argument with respect to *Camasta* is flawed for two reasons. First, from a legal perspective, the *Camasta* court merely repeated the well-accepted rule that the standing inquiry for the purpose of injunctive relief is probabilistic, *i.e.*, is there "likelihood" that some harm will be suffered by the plaintiff in the future? *Camasta*, 761 F.3d at 740-41. Interpreting the *Camasta* court's dicta to instead announce a broad rule that strips a prospective plaintiff of standing to seek an injunction solely because they are aware of a past wrong overreads that court's language and leads to anomalous results. For example, just because someone is aware that the police have acted brutally in the past does not automatically deprive that person of standing to enjoin brutal police activity *so long as* they can show such brutality is *likely* to harm him/her in the future. *Cf. Schirmer v. Nagode*, 621 F.3d at 588 (highlighting that, in such a case, official action conducted pursuant to a policy and/or procedure may be sufficient to establish Article III standing).

Second, *Camasta* is factually distinguishable. The only allegation in the complaint with respect to Camasta's likelihood of suffering future harm was the sweeping assertion that "'there [wa]s a substantial danger that [the defendant's] wrongful retail practices w[ould] continue.'" *Camasta,* 2013 WL 474509, at *6. Here, Le has alleged that Kohls "continues" to engage in a "company-wide, pervasive" marketing campaign that "has been consistently implemented" across the nation. (Docket #1 ¶¶ 27-28). While Le may recognize that Kohls' allegedly deceptive scheme is afoot, Le has alleged a realistic fear that Kohls' misleading marketing scheme will likely continue to cause economic harms to consumers. At this juncture in the litigation, these allegations suffice to establish Article III standing. *See e.g.*, *Russell*, No. 5:15-CV-01143-RGK-SP, slip op. at 7 (dismiss the defendant's standing challenge).

In sum, Le has alleged all that is required of him under Article III for the purpose of maintaining his claim for injunctive relief under the UCL. Kohls' motion to dismiss on this ground will be denied.

### 3.3 Le's Claim on Behalf of a Multi-State Class of Consumers

Le's third claim for relief alleges that Kohls' conduct has violated the consumer protection laws of 40 states and the District of Columbia. (Docket #1 ¶¶ 78-92). Le brings this claim "individually under the laws of California and on behalf of all other persons who purchased merchandise in" states that maintain consumer protection laws similar to those of California. (Docket #1 ¶¶ 79-92). Kohls argues that Le's claim must be dismissed under Rule 12(b)(1) because he lacks constitutional standing to sue under the laws of states in which he does not reside and has suffered no injury. (Docket #19 at 20-21). Le responds that: (1) he has constitutional standing to pursue his claim; and (2) Kohls' argument conflates standing with class certification under Federal Rule of Civil Procedure 23. (Docket #24 at 23-28).

As discussed previously, "[s]tanding is an essential component of Article III's case-or-controversy requirement." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Article III courts must be sure of their own jurisdiction before deciding the merits of the case before them.[9] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88–89 (1998). "Plaintiffs have

---

[9]Though not argued by the parties in this case, some district courts in the Seventh Circuit have interpreted *Payton v. Cnty of Kane*, 308 F.3d 673 (7th Cir. 2002), to require resolution of class certification issues prior to resolving issues related to standing. *See, e.g., Kuhl v. Guitar Ctr. Stores, Inc.*, No. 07 C 214, 2008 WL 656049, at *1 (N.D. Ill. Mar. 5, 2008). In light of *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008), others have not. *See, e.g., In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09 CR 3690, 2013 WL 4506000, at *5 (N.D. Ill. Aug. 23, 2013). Neither Le nor Kohls argue that this court should defer a ruling on the standing question with respect to Le. As such, the Court finds itself obliged to address the issue here.

standing if they have been injured, the defendants caused that injury, and the injury can be redressed by a judicial decision." *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011). "When deciding questions of standing, courts must look at the case as a whole, rather than picking apart its various components to separate the claims for which the plaintiff will be entitled to relief from those for which he will not." *Arreola*, 546 F.3d at 795.

Standing issues in the context of class actions can be nuanced and confusing. *See Payton*, 308 F.3d at 681 ("This question of 'standing' is just one part of a rather complex network of rules regulating class actions, under which the named plaintiff is the critical actor for some purposes, every individual member of the class is relevant for other purposes, and the class as a whole is the focal point for yet other purposes."); *cf. Arreola*, 546 F.3d at 794-95 ("Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing. Standing is a prerequisite to filing suit, while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is entitled to relief."). On the one hand, it is well settled that "[b]efore a class is certified… the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009). Less clear, however, is whether a named plaintiff, like Le, has constitutional standing to maintain a class action claim under the laws of states in which he does not reside and/or was injured. *Compare In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010) *with In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090 (D.N.J. Oct. 20, 2011).

District judges across the nation have decided this question differently,[10],[11] and the parties both cite to a litany of cases reflecting this split in authority—none of which are binding on this Court. (Docket #24 at 25-28; Docket #26 at 17-19). However, in light of Seventh Circuit precedent, the Court is obliged to conclude that Le has standing to pursue his claim on behalf of a putative, multi-state class of consumers at this time.

Though the Seventh Circuit has not decided the precise question at issue here, its opinion in *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) is instructive. In that case, plaintiffs from Missouri, Georgia, Illinois, and Utah brought a class action claim under the Illinois Consumer Fraud Act ("ICFA") against a conglomerate of online travel agencies, referred to collectively as "YTB." *Morrison v. YTB Int'l, Inc.*, 641 F. Supp. 2d 768, 782 (S.D. Ill. 2009). The lower court granted YTB's motion to dismiss the claims

---

[10]For cases ruling that standing existed see: *In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 377-78 (E.D.N.Y. 2010); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *5 (N.D. Ill. Nov. 5, 2009); *Indergit v. Rite Aid Corp.*, 2009 WL 1269250, at *4 (S.D.N.Y. May 4, 2009); *Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 505-06 (D.N.J. 2009); *Doyel v. McDonald's Corp.*, 2009 WL 350627, at *1 (E.D. Mo. Feb. 10, 2009); *Sheet Metal Workers Nat. Health Fund v. Amgen Inc.*, 2008 WL 3833577, at *9 (D.N.J. Aug. 13, 2008); *Potts v. United Parcel Serv., Inc.*, 2007 WL 551555, at *1 (N.D. Ill. Feb. 15, 2007); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 504–05 (S.D.N.Y. 1996).

[11]For cases ruling that standing did not exist see: *Martin v. LG Elecs. USA, Inc.*, 2015 WL 1486517, at *17 (W.D. Wis. Mar. 31, 2015) (failing to address the effect of *Morrison*); *Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*, 2014 WL 943224, *12 (D. Minn. Mar. 11, 2014); *In re Dairy Farmers of Am., Inc. Cheese Litig.*, 2013 WL 4506000, at *7-*8 (N. D. Ill. Aug. 23, 2013) (also failing to recognize *Morrison*); *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, *10 (D. N.J. Oct. 20, 2011); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 657 (E.D. Mich. 2011); *Catlin*, 2011 WL 1002736, at *8; *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 924 (N.D. Ill. 2009); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 152–56 (E.D. Pa. 2009); *In re AIG Advisor Group Sec. Litig.*, 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007).

made by the non-Illinois plaintiffs on the ground that they did not have Article III standing. *Morrison*, 649 F.3d at 534.

The Seventh Circuit found error in that decision. *Id.* at 536. It held that the out-of-state plaintiffs did have constitutional standing to pursue claims under the ICFA. *Id.* ("Plaintiffs allege that they are victims of a pyramid scheme that saddled them with financial loss, which YTB caused. The judiciary can redress that injury by ordering YTB to pay money to the victims. Nothing more is required for [constitutional] standing."). Though the plaintiffs did not live in Illinois, and were (potentially) uninjured in Illinois, those facts did not—from an Article III standing perspective—bar them from pursuing claims under Illinois' consumer fraud statute. *Morrison*, 649 F.3d at 536. Rather, the Court, in keeping with its instruction in *Arreola*, "look[ed] at the case as a whole" to determine whether the plaintiffs were injured by the defendant's conduct and whether the court could redress that harm. *Id.*; *see also Arreola*, 546 F.3d at 795. Furthermore, the court explained that even if the ICFA did "not apply because events were centered outside Illinois, then plaintiffs must rely on some other state's law; this application of choice-of-law principles [however] has nothing to do with *standing*, though it may affect whether a class should be certified.…" *Id.* (emphasis in original). In this sense, the court distinguished subject-matter jurisdiction—"a synonym for adjudicatory competence"—from the merits of the suit or the law under which a claim may proceed. *Id.; see also Cohan v. Medline Indus., Inc.*, 2014 WL 4244314, at *1 (N.D. Ill. Aug. 27, 2014) (ruling, under *Morrison*, that a non-Illinois plaintiff, on behalf of putative class members from across the nation, had standing to sue under Illinois law even though he did not work and was not injured in Illinois).

Under *Morrison*'s reasoning, the Court concludes that Le has constitutional standing to pursue his claim on behalf of a multi-state class of consumers. Like the out-state-plaintiffs in *Morrison*, the fact that Le does not live, nor was injured, in the 40 states under which his claim may arise is of no constitutional moment. *Id.* Similar to *Morrison*, Le has asserted that Kohls' allegedly deceptive pricing scheme injured him, and this Court can remedy Le's alleged injury by ordering Kohls to pay Le some measure of restitution (assuming he proves up those damages under the applicable law). That is all that the Article III standing inquiry requires. *See id.* That California law may not apply to this claim is likewise of no constitutional significance because "application of choice of law principles has nothing to with *standing*...." *Id.* (emphasis in original).

Moreover, with regard to the choice of law issue, it bears mentioning that Le is pursuing this claim "*individually under the laws of California*," namely the UCL and CLRA. (Docket #1 ¶ 79). As discussed above, Le has constitutional standing to pursue relief under those statues. It is unclear, at least on the pleadings, whether the claim will continue to be litigated under the laws of California or some combination of other states' statutes. *Cf. In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d at 377 ("Whether the named plaintiffs have standing to bring suit under each of the state laws alleged is "immaterial" because they are not bringing those claims on their own behalf, but are only seeking to represent other, similarly situated consumers in those states."). This will be the proper focus of the class certification process. *Morrison*, 649 F.3d at 536; *see also* 7A Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 1780.1 (3d ed. 2014) ("As a matter of general principle, the predominance requirement of Rule 23(b)(3) will not be satisfied if the trial court determines that the class

claims must be decided on the basis of the laws of multiple states" because "the legal issues no longer pose a common question").

The Court's conclusion also recognizes that "[t]he underlying standing principle is that the injury that a plaintiff suffers defines the scope of the controversy that she is entitled to litigate." NEWBERG ON CLASS ACTIONS § 2:6 (5th ed.). Here, Le claims that he and the putative class members have suffered a common injury as a result of Kohls' nationwide, pervasive advertising scheme. (Docket #1 ¶¶ 27-28, 84-92); *see also In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *5 ("All Plaintiffs have allegedly suffered identical injuries caused by several parties related by a conspiracy to fix prices. Therefore, the named plaintiffs' capacity to represent individuals from other states depends upon obtaining class certification, and the standing issue would not exist but for their assertion of state law claims on behalf of class members in those states.") (internal citations omitted). Whether or not Le may adequately represent these yet unnamed and uncertified classes of consumers with which he has suffered a common injury is a proper subject of the Rule 23 inquiry.

While the Court appreciates Kohls' prudential concerns about the effect of such a claim, the legislature, through the Class Action Fairness Act, has "authorize[d] federal judges to resolve big-stakes, multi-state class actions." *Morrison v. YTB Int'l, Inc.*, 649 F.3d at 536. These prudential concerns are not sufficient to override the Court's conclusion that the plaintiff has constitutional standing. Thus, the Court will deny Kohls' motion to dismiss on this ground, with the understanding that should standing issues again arise during the course of class certification, the parties may raise them as they deem appropriate.

### 3.4    WDTPA Claim

Le also claims that Kohls violated the WDTPA. (Docket #1 ¶¶ 64-70). Kohls argues that Le's claim under the WDTPA must be dismissed under Rule 12(b)(6) because the statute applies only to statements "made" in Wisconsin.[12] (Docket #19 at 21-22). Thus, according to Kohls, since the only deceptive statements Le "saw" were in California, he fails to state a claim under the WDTPA. (Docket #19 at 21-22). Le frames this issue differently, and argues that non-Wisconsin residents have statutory standing to sue under the WDTPA. (Docket #24 at 24).

> The WDTPA provides that:
>
> No...corporation...with intent to sell...merchandise...to the public for sale,...*shall make*, publish, disseminate, circulate, or place before the public,...*in this state*, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind... which...is untrue, deceptive or misleading.

Wis. Stat. Ann. § 100.18(1) (emphasis added). "[S]tatutory interpretation 'begins with the language of the statute.'" *State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 663, 681 N.W.2d 110, 124. This rule reflects the Wisconsin Supreme Court's command that courts are to "assume that the legislature's intent is expressed in the statutory language." *Id.* at ¶ 44. "Statutory language is given its common, ordinary, and accepted

---

[12]Kohls' constitutional standing argument also applies to all of Le's non-California claims. (Docket #19 at 20–21). However, for the reasons discussed above (*see supra*, Part 3.3-3.4), the Court finds that Le does have constitutional standing to pursue claims that do not arise under California law. *See Morrison*, 649 F.3d at 534.

meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.* at ¶ 45.

The Court concludes that Le alleged sufficient facts to maintain his claim under the WDTPA. On the one hand, the statute's language requires that actionable statements under the WDTPA be "made" in Wisconsin.[13] *See* Wis. Stat. § 100.18(1) (West); *see also Gilson v. Rainin Instrument, LLC*, 2005 WL 955251, at *12 (W.D. Wis. Apr. 25, 2005) ("[I]n order for liability [under Wis. Stat. § 100.18(1)] to attach there must be some statement made in Wisconsin."). However, the ordinary meaning of the verb "to make" is "[t]o cause (something) to exist." *See* MAKE, BLACK'S LAW DICTIONARY (10th ed. 2014). Here, Le alleges that Kohls' principal place of business is in Wisconsin and its "acts, practices and policies pertaining to the advertising, marketing, and sale of merchandise…*were established and emanated from Wisconsin.*" (Docket #1 ¶¶ 11-12, 14); *see also* ESTABLISH, BLACK'S LAW DICTIONARY (10th ed. 2014) ("2. To make or form; to bring about or into existence"). Moreover, Le alleges that Kohls' scheme was executed "company-wide" across all of Kohls' stores. (Docket #1 ¶¶ 27-28). Thus, even if Le "saw" Kohls' allegedly deceptive statements in California, the advertisements that comprise the basis of Le's claims indeed were "made," and then

---

[13]The WDTPA has been amended numerous times since its inception in 1913. *See State v. Automatic Merchandisers of Am., Inc.*, 64 Wis. 2d 659, 662, 221 N.W.2d 683, 685 (1974) (providing an overview of the amendments made to the WDTPA, which is currently codified as Section 100.18). Since 1913, it has contained the language at issue here. *See* Wis. Stat. § 1747(k) (1913) (proscribing false advertisements "ma[de]…in this state"). As legislative histories were not recorded in Wisconsin until 1927, this Court does not have the benefit of the enacting legislature's drafting records with respect to this text. *See Drafting Files*, WISCONSIN STATE LEGISLATURE, https://docs.legis.wisconsin.gov/drafting_files (last visited Feb. 4, 2016).

"disseminated," by Kohls from its Wisconsin headquarters. Kohls' motion to dismiss Le's WDTPA claim will, therefore, will be denied.[14]

### 3.5 Unjust Enrichment Under Wisconsin Law

Le's complaint also alleges a common law unjust enrichment claim. (Docket #1 ¶¶ 71-73). He pleads this claim under Wisconsin law, on behalf of himself and national class of consumers, and, alternatively, under California law, on behalf of himself and a class of California consumers. (Docket #1 ¶¶ 71-73). Each of these claims will be discussed separately. *(See infra*, Part. 3.6).

On the one hand, Kohls moves to dismiss Le's Wisconsin unjust enrichment claim on the grounds that Le's purchases from Kohls formed "express contracts" between the parties. (Docket #19 at 22). These "express contracts," according to Kohls, bar Le's recovery under the equitable doctrine of unjust enrichment, and thus Le's claim should be dismissed under Rule 12(b)(6). (Docket #19 at 22). On the other hand, Le agrees with the principle of law articulated and argued by Kohls, but clarifies that his unjust enrichment claim does not proceed on an "express contract." (Docket #24 at

---

[14]As referenced above, Le responds to Kohls' position by arguing that he has *statutory* standing to sue under the WDTPA, even though he is a non-resident. (Docket #24 at 24). This argument is confusing. First, Le neither states nor applies the "zone of interests" test, which is required when raising the issues of statutory standing. *United States v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607, 617 (7th Cir. 2015). Second, Le's argument is entirely distinct from Kohls' point, which is that Kohls allegedly did not "make" any actionable statements under the WDTPA because Kohls "made" no actionable statements in California. (Docket #24 at 21-22). Ultimately, Kohls' argument is one that is best understood as one that arises under Rule 12(b)(6), rather than Rule 12(b)(1). Moreover, as discussed at length above, this Court does find that Le has Article III standing to pursue his claims, and that Kohls has "made" actionable statements under the WDTPA because its allegedly deceptive marketing scheme was "established" and "disseminated" from Wisconsin.

30-31). Rather, Le argues that he brings this unjust enrichment claim in an equitable sense, *i.e.*, he is suing off the contract for restitution. (Docket #24 at 30-31). And, Le argues that even if an express contract were formed when he purchased Kohls' merchandise, such a contract was voidable in light of Kohls' deceptive price scheme. (Docket #24 at 30-31).

The Court concludes that Le's claim for unjust enrichment can survive a motion to dismiss because Le has alleged that any purchase contracts between himself and Kohls are potentially voidable.

"The elements of an unjust enrichment claim are: (1) conferral of a benefit[;] (2) with the knowledge of the party benefitted[;] and (3) under circumstances where it is inequitable to permit the party to retain the benefit without payment." *U.S. ex rel. Roach Concrete, Inc. v. Veteran Pac.*, JV, 787 F. Supp. 2d 851, 858 (E.D. Wis. 2011); *see also Watts v. Watts*, 137 Wis. 2d 506, 531, 405 N.W.2d 303, 313 (1987). "In Wisconsin the quasi-contractual theories of quantum meruit and unjust enrichment are legal causes of action grounded in equitable principles and can be invoked only in the absence of an *enforceable* contract." *Carroll v. Stryker Corp.*, 658 F.3d 675, 682 (7th Cir. 2011) (emphasis added). A purchase transaction, for example, forms a contract between the buyer and the seller. *Meyer v. The Laser Vision Inst.*, 2006 WI App 70, ¶ 22, 290 Wis. 2d 764, 779, 714 N.W.2d 223, 230 (holding that the parties' purchase transactions formed a "valid and enforceable [contract], thereby barring [the plaintiff's] equitable claims"). However, where there is not an underlying, enforceable contract between the parties, an unjust enrichment claim may lie. *Cf. Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) ("A contract induced by fraud is voidable at the option of the party whose assent was fraudulently induced…'If a party's manifestation of assent is induced by either a fraudulent or a material

misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.'") (citing RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (1981)); *Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well.").

Le alleges that Kohls misrepresented the prices on its merchandise, and that Le would not have purchased (or would have paid less for) Kohls' products but for being misled about the merchandise's prices. (*See generally* Docket #1). The facts are not sufficiently developed for the Court to be able to opine on the viability of Le's unjust enrichment claim, because the allegations underlying Le's claims have not be fully fleshed out. On the one hand, discovery may reveal that Le's purchase transactions with Kohls may have indeed formed valid and enforceable contracts between the parties, thereby precluding Le's claim under Wisconsin law. *Carroll*, 658 F.3d at 682. However, the bases of Le's claims under the UCL, CLRA and WDTPA are that Kohls misrepresented the true value of its goods and, with these claims still outstanding, it is simply too premature to dismiss Le's related claim of unjust enrichment. (Docket #1 ¶¶ 8, 21, 23-29).

Kohls also argues that Le's claims should be dismissed because: (1) Le did not allege that he "justifiably" relied on any misrepresentations from Kohls; and (2) Le did not allege that he "in fact voided the contracts." (Docket #26 at 21). These arguments are not persuasive. First, Le did allege that he and other consumers "reasonably rel[ied]" on Kohls' deceptive advertising scheme. (Docket #1 ¶¶ 23, 31, 113). Though, it is true that Le did not insert the word "justifiable" into the complaint, the Court refuses to adopt such a

strained reading of the pleading. *Cf. Van Dorn v. Peters*, No. 14-CV-03920, 2015 WL 1396492, at *4 (N.D. Ill. Mar. 24, 2015) ("The terms 'justifiable' and 'reasonable' when considering reliance are used interchangeably."). Second, Kohls' one sentence reference to the difference between a void and voidable contract does nothing to support its position that Le's claim should be dismissed. (Docket #26 at 21). To be sure, there is a difference between a void and voidable contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 7 (1981). But, Kohls cites to no authority standing for the proposition that a party must allege in his/her complaint that a contract has *already* been disaffirmed in order to maintain an equitable claim for relief. *Id.* at cmt. d. ("In some cases the power [to disaffirm] may be lost by unreasonable delay in returning benefits received or in manifesting the election to avoid. In other cases…manifestation of intention [to disaffirm] is necessary until an action is brought against the party having the power of avoidance.").

In sum, because Le's underlying purchase transactions may be voidable, the Court declines to dismiss Le's unjust enrichment claim at this juncture. *See In re JPMorgan Chase Bank Home Equity Line of Credit Litig.*, 794 F. Supp. 2d 859, 884 (N.D. Ill. 2011) ("The court agrees that the existence of an express contract potentially covering these claims is not fatal at this stage and declines to dismiss Plaintiffs' unjust enrichment claims on this basis."); *Yakas v. Chase Manhattan Bank, U.S.A., N.A.*, No C 09–02964 WHA, 2010 WL 367475, at *7 (N.D. Cal. Jan. 25, 2010) ("At this point, the Court is unwilling to categorically exclude the possibility that unjust enrichment will turn out to be an appropriate remedy.").

### 3.6 Unjust Enrichment under California Law

Alternatively, Le seeks to pursue his claim for unjust enrichment on behalf of himself and a California Class under California law. (Docket #1

¶¶ 71-73). Kohls argues that a free-standing unjust enrichment claim is not recognized under California law. (Docket #19 at 20) (citing *Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1138 (2010)*; Corby v. Am. Exp. Co.*, 2011 WL 4625719, at * 9 (C.D. Cal. Oct. 5, 2011)). However, Le points out that Kohls' position stems from a single California appellate decision which has since been called into question. (Docket #24 at 32) (citing *Hirsch v. Bank of Am.*, 107 Cal. App. 4th 708, 721-22 (2003); *Hernandez v. Lopez*, 180 Cal. App. 4th 932, 938 (2009)).

Under the reasoning of the Ninth Circuit's recent opinion in *Astiana v. Hain Celestial Grp, Inc.*, the Court finds that Le's claim for unjust enrichment under California common law can proceed at this pleading stage. 783 F.3d 753, 762 (9th Cir. 2015); *see also Ghirardo v. Antonioli*, 14 Cal.4th 39, 50, 54 (1996) (holding that a plaintiff was "entitled to seek relief under traditional equitable principles of unjust enrichment" where other remedies were unavailable and that a claim "for payment of money…rest[ed] on a theory of unjust enrichment") (internal quotation marks omitted). On the one hand, it is correct, as Kohls argues, that until very recently "federal courts [had] consistently followed [*Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003)] and held that California law does not recognize a cause of action for unjust enrichment, so long as another cause of action is available that permits restitutionary damages." *In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1114 (C.D. Cal. 2012). However, the Ninth Circuit has since clarified that while "there is not a standalone cause of action for unjust enrichment, which is synonymous with restitution…when a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution." *Astiana*, 783 F.3d at 762. The *Astiana* court instructed that such a claim should not be dismissed because a party may set

out alternative claims for relief. *Id.* (citing Fed. R. Civ. P. 8(d)(2)). Accordingly, the Ninth Circuit found the allegation that the defendant had enticed plaintiffs "to purchase their products through false and misleading labeling, and that [defendant] was unjustly enriched as a result," was "sufficient to state a quasi-contract cause of action." *Id.*

Several federal district courts "have permitted what were previously considered to be superfluous unjust enrichment claims to survive the pleading stage in light of the Ninth Circuit's decision in *Astiana.*" *Valencia v. Volkswagen Group of America, Inc.*, 2015 WL 4747533, at *11 (N.D. Cal. Aug. 11, 2015) (denying a motion to dismiss an unjust enrichment claim because "*Astiana* provides that plaintiffs are permitted to plead an unjust enrichment claim in the alternative…even if, as here, it is questionable whether that alternative claim provides any prospect for relief independent of the causes of action already alleged"); *Trazo v. Nestle USA, Inc.*, 2015 WL 4196973, at *2 (N.D. Cal. July 10, 2015) (finding "*Astiana* requires this court to…reinstate his claim for restitution based on unjust enrichment/quasi-contract."); *Khasin v. R.C. Bigelow, Inc.*, 2015 WL 4104868, at *3 (N.D. Cal. July 7, 2015) (permitting plaintiff to amend complaint to allege unjust enrichment cause of action given the Ninth Circuit's decision in *Astiana*); *Romero v. Flowers Bakeries*, LLC, 2015 WL 2125004, at *9 (N.D. Cal. May 6, 2015) (relying on *Astiana* to deny motion to dismiss an unjust enrichment claim because, even though "the claim may be duplicative of Plaintiff's statutory claims under the UCL, FAL, and CLRA[, that] is not a proper ground for dismissal at this stage of the litigation.…"); *but see Lanovaz v. Twinings N. Am., Inc.*, 2015 WL 3627015, at *5 (N.D. Cal. June 10, 2015) (declining to reinstate unjust enrichment claim).

In keeping with the Ninth Circuit's interpretation of California law, the Court concludes that, at this stage, to the extent Le alleges an unjust enrichment/quasi contract claim under California law, the Court will allow it to proceed.

4.      CONCLUSION

In conclusion, the Court finds that Kohls' motion to dismiss pursuant to Rule 12(b)(1) and 12(b)(6) must be denied in its entirety. (Docket #18). As explained more fully above, Le: (1) may be entitled to restitution under the UCL and CLRA; (2) has constitutional standing to pursue each of his claims; (3) alleged sufficient facts to show that the purportedly deceptive statements made by Kohls were indeed "made" in Wisconsin for the purpose of his WDTPA claim; and (4) pled all that is necessary under Wisconsin and California law for the purpose of his unjust enrichment/quasi contract claim.

Accordingly,

IT IS ORDERED that Kohls' motion to dismiss (Docket #18) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 8th day of February, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge